May it please the Court, I am Suzanne Ambrose representing the Attorney General Bill Lockyer in this matter, the appellant. And with the Court's permission, the Intervenors' Council, Mr. Cromlin and I have decided to split the 20 minutes evenly so that I will be speaking for 10 minutes and he'll be speaking for 10 minutes. Okay. I would like to reserve two of my 10 minutes for rebuttal. You can watch the clock and we'll try and stay pretty close. Go ahead. This case presents the question whether in setting federal labor relations policy through enactment of the NLRA, Congress intended to deprive the states of their sovereign right to determine how to spend their grant and program funds. In enacting the grants and programs provisions of AB 1889, California is not preventing employers from assisting, promoting, or deterring union organizing. It's merely prohibiting the state's subsidization of those activities. Employers are free to engage in those activities, provided they don't use state money to do so. Counsel, would you define for me state money? I look at a dollar bill and it says this is legal tender for any debt, public or private. Okay. So I figure if it's a dollar bill, I can spend it wherever I want. Right? Correct. If I've got a dollar bill. Right. What's state money? Does it say state of California, this is state money? Well, the term state funds is defined. State funds. Okay. The term is defined in AB 1889. And it's money drawn from the state treasury. All right. So if somebody draws money from the state treasury, it's for a public purpose. And it is expended for a public purpose. And when it's expended, it loses its state character. Right? So in the hands of a vendor to the state, the state gets what the quid pro quo for the contract. The vendor gets the money. And now the vendor can use the money for interfering in a labor election. Is that right? Well, that may be the case. It really may be the case. I want to know if it's still state funds. Well, the sections at issue in this appeal are not the contractor provisions of AB 1889. It's the grants and programs provisions. All right. If I contract with the state to provide a program, and I provide it, and I get paid for it in terms of the contract, when the funds are in my hands as the vendor of the program, they're my funds to do what I see fit with so long as I have given the state the consideration that it bargained for. Correct? Well, except, Your Honor, in the case of grants and programs, we're not talking about a traditional business transaction where a vendor is providing a product that it obtained or purchased at wholesale and then giving it to the state for a markup, a 10 percent. For a study or a report or providing nurses on wards, whatever it may be. Once that's done and I have my profit from it, if I am a profit agency, or even if I'm a not-for-profit, there's an override above what it actually costs. It's paid to the agency. When does it not become state funds? The tracing is what I'm trying to figure out. Well, we ask what people do at different stages of a program makes a big difference. Correct. We actually dispute that there's a profit made off of grants and programs. There is no evidence in the record that anyone who obtains a subsidy in the form of a grant from the state to carry out a governmental function is making a profit. All right, if I'm somebody like the United Good Neighbors and I have a board of trustees and I take them to lunch once a month. Now, where's that coming from? It's obviously coming from either contributions or where they do work for the state. If they do work for the state, doesn't some of that money accrue to provide a fund to pay for the lunches of the directors? It would depend on the restrictions contained in the grant or program. I mean, there are restrictions over and above what these restrictions include on all grants and programs, whether it's federal or state. Is the state then making a direct interference with the right of the agency or the provider to enter into labor negotiations and contracts, including the representation election? No, not not really. They can get into the representation election and say, don't vote for representation. Yes, they can, provided they don't use state funds to do so. Okay. In your grant programs, do the grantees traditionally have to segregate funds into some form of account? That is very routine. There are several state and federal statutes and regulations that require recipients of grant funds and program participants to account for their expenditures. What are common examples of that? Well, in, for instance, the Medi-Cal program, there are a whole list of allowable and disallowable costs. Specifically, what type of costs would be allowable or not allowable in these Medi-Cal programs, for example? Allowable costs would include, you know, providing, paying salaries for nurses. Let me clarify. Let's go to the ones that are not allowable then. That would be similar to a regulation such as being promulgated here. Well, they have televisions in hospital rooms, right? That's one of them. Correct. I mean, I think normal, you know, operating expenses are going to be allowable. Overhead lighting is going to be allowable. Perhaps, you know, lunches to take the board of directors out are not going to be allowable. Perhaps. That's, I think, a question that may be bothering all of us is what happens at the margin when it's close? One of the arguments that's being advanced here is that in the course of putting strings on dollars for particular use, it creates a regime where the employer is at risk of having to do battle to account for how it actually used the funds, the source of funds, and that creates a regime where now there's going to be litigation with potential substantial penalties that puts the employer at risk, and the way to avoid that risk is simply to withdraw from the field of taking positions in a representation election, even though it may be adverse to its interest to be silent. But at the risk of having to say something and buying a lawsuit, it doesn't say anything, and that, therefore, gets it into conflict with the NLRA and machinists, which basically carves out the representation election as a free speech zone, free speech in the sense of labor free speech. How do you respond to that? Well, I'd like to make several points, actually. These restrictions are not unique to AB 1889. In one sense, they help clarify that problem that employers have with determining whether or not these are necessary expenditures to carry out the program or grant. The legislature is actually helping out the employer in a certain respect by telling them these types of costs are not necessary. Lobbying your employees is not necessary in order to provide health care, for instance. The fact that an employer chooses to be 100% funded by the state is their choice. There's nothing in the state provisions that require an employer to do that. These restrictions are far less onerous than those upheld by the Supreme Court in the First Amendment cases. Then they're proprietary contract terms and not regulatory terms? They are. Is that the state's position? The state's position is that it's a proprietary action. And it's not a regulatory scheme? No, it is not. I see that I'm down to 55 seconds on my time. We'll give you some more minutes when you come back. Okay, thank you. Since we've taken up a lot of your time on our questions. Thank you. Thank you. Could you address the question that still bothers me, please? And that is in the context of representation elections. And let me pose a question based on the First Amendment area under Lynn preemption. In an election battle, the court has said that there is preemption of state defamation laws, except to the extent that the employer who wants to bring a lawsuit for defamation can meet a very high standard. Now, that creates a model in which you can have a hotly contested election, and the employer sues the union for having defamed the employer in the context of this representation election. And the court has said, well, that we're very concerned that we not curb the free flow and the robust debate, but because the state has an interest and a long history of providing relief for defamation, where there's a high standard of malice and so on and so forth and clear. Why is that not parallel to this situation where the state is saying, we're going to condition the use of the grant money, and you're free to go ahead. They can have the robust debate, but there's this area that's carved out that the state can still control, which is the use of its own money, just as the state or the legal institutions of the state can carve out and say, there's some constraints within this election process, and that is you can't engage in defamation either. Is your argument that the NLRA makes the election process sacrosanct so that the state can't impose any kind of regulation or constraint on what goes on in it? Well, I'm Scott Cohen. I'm representing the AFL-CIO in the Cal Labor Federation. But it's the union. I mean, the argument that's being made is the unions are going to use this and use it to harass the employer and show their speech. Well, I would certainly compare this in terms of state. Sorry, I did cut you off before you could announce your appearance. Sure. Two things. First, I think we have to look at grants and program funds and what restrictions are already there. When grantors give out money, they put strings on them, and a good example are the federal grant and program fund restrictions, many of which are in the record. There are a couple of OMB circulars in the excerpts of record about what costs the federal government will and will not pay for. All right, but is that in an area where there is an overarching national labor policy that has, under machinists, has been said essentially preempts the field? And that's the argument here is that there's this area of a free zone in which the robust debate between the employer and the union is sacrosanct. Are there parallels in any of the First Amendment cases? Yes, there are parallels in the First Amendment cases. Let me say first that the federal government has the same restriction on some of its funds. Not in the labor area. Well, yes, it has restrictions on the use of funds to assist, promote, and deter union organizing that are word for word the same as California's in the Workforce Investment Act, the National Community Service Act, the Head Starts Programs Act. There's a provision in the Medicare Act applies to tens of thousands of employers that allowable costs don't include costs to influence employees about unionization. This is just another cost that the government won't pay for. And it is directly analogous to a case like Regan v. Taxation Without Representation, which involved payment for lobbying costs. And in Regan, the Supreme Court held that it was okay for the government to prohibit lobbying with tax-exempt money because a tax exemption is a form of subsidy like a grant. And while you have a very, very strong First Amendment right to lobby, the government doesn't have to subsidize your lobbying activity. And the argument was actually made in Regan about burden and chill. And the nonprofit organization said, but we'll have to comply with these IRS record-keeping requirements if we decide to lobby. And the requirement was, and it's almost exactly the same requirement as in AB 1889, that you have to keep records adequate to show that tax-deductible contributions are not used to pay for lobbying. And the Supreme Court's exact words were, this is not unduly burdensome. I think it's also significant that the Court said in that case, Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for the plaintiff's lobbying. It's the same here. The State is not regulating any NLRA-protected activity. The State is regulating the use of its own funds. Employers are not penalized for engaging in NLRA-protected activity. They're not punished for engaging in it. It's not a case like Gould where the State is refusing to do business with someone because they engage in this activity, or Golden State where the State won't give you a license. Employers are perfectly free to engage in the activity as long as they don't use the State's money. And this grant restriction is like many, many other restrictions and grants. Again, the record contains about 30 pages of detailed Federal restrictions on what they will and won't pay for. Well, the Federal restrictions are just that. They're Federal restrictions, and the NLRA is a Federal law, so Congress presumably can make choices. Is the State free to make choices vis-a-vis the NLRA, the same as the United States Congress? No, I don't cite those to say that because Congress passed those restrictions, the State action is in NLRA preempted. But preemption is a matter of congressional intent. The fact that Congress has the same restrictions on the use of its grant money and Congress places strings on its program funds shows that it's unlikely that Congress intended to intrude on the State's sovereignty to control how the State's own money is spent. Well, let me ask you this then. Let's suppose that this case had emerged after it had actually been implemented and what we were looking at is a situation where an employer had been tagged with an enormous fine in a hotly contested case where the evidence of the use of funds was marginal, but because of the deference that we would pay to the findings of fact and the like of the district court, we couldn't overturn it on a fact-based matter, but the implications of sustaining it were clear that no employer in their right mind would want to take the risk in the future of engaging in any kind of advocacy to the extent they had significant amount of State grant money. And the argument was being made to this, is this is absolutely chilling employer-free speech in the election process. Would you say that that's too bad, that that's irrelevant, it's not under machinists, we wouldn't be taking a look at that to see whether that was trenching on NLRA-protected activity? No, I wouldn't say it's irrelevant, but I would say it's not an issue to be dealt with on a facial challenge to the statute. It's a hypothetical about how the State courts might apply the statute and you can't presume that they're going to apply it in an unreasonable way so it's going to be used to harass people. In Lynn, after all, what the Supreme Court did is it held preemptive part of the remedy for defamation, part of the defamation law, not the whole thing. It protected the State's what it called a deeply rooted local interest in redressing defamation. If that was a deeply rooted local interest, certainly controlling how the State's own money is spent is a deeply rooted local interest. You ask any governor, I'm sure they would tell you they care more about controlling how the State's money is spent than they care about defamation law. That was the argument yesterday. Different, that's the recall, we'll get, we'll stay away from that here. But what I'm saying is that hypothetical could be dealt with if it ever happens, which it hasn't. This is a facial challenge to the statute. The enforcement provisions here are not unusual. I compare it to the Byrd Act. That's Congress's statute that says you can't use any Federal money to lobby about the award of Federal contracts. There are fines up to $100,000 for violating the statute and that involves a core First Amendment right. If you engage in a de minimis violation of this statute, AB 1889, the fine's going to be a very de minimis amount of money because it's based on the amount of misspent funds. This really isn't an unusual, harsh, harassing, remedial scheme. Similar to the scheme in the environmental laws, a lot of wage and hour laws in California. Counsel, you just a moment ago said this is a facial challenge. Would you state the reasons why you feel it's a facial challenge rather than as applied? Sure. It's a facial challenge because what the Plaintiffs are seeking is a declaration that the statute doesn't apply to any employers covered by the NLRA under any circumstances, and the only facts that are actually undisputed on summary judgment are that these are employers who are covered by the NLRA and are subject to AB 1889. We don't have any facts about how it's going to work in practice, and no distinctions are being made about it being unconstitutional or preempted as applied to a particular circumstance. And that's why under the facial challenge rules, which this Court reaffirmed in the S.D. Myers case, you need to show that the statute can't be applied in a valid manner. The statute on its face is broader than you have narrowed it. You've narrowed the statute considerably by the class you've selected as opposed to the breadth, the entire breadth of the statute is written. What you're saying is that there are other provisions of the statute not before the Court which might be broader than the ones the Court has before it now, and I would agree with that. But the Court has before it these. Is this bill a facial challenge to the Act? Well, I think it's a facial challenge to these provisions of the Act. Just because they're included in the same statute rather than, you know, listed as separate sections of the Code shouldn't change that. No, but if you look at the bill that the legislature passed in its entirety, including its prefatory remarks that are quoted in your briefs, do we ignore that? I don't think you ignore the prefatory remarks. Well, look at the whole statute and its interrelationship, right? I think you look at the whole statute, but the question here is whether these two provisions are preempted. There's a very strong severability clause in the statute, very, very strong. No one disputes that these provisions of the statute can operate independently of provisions that impose other restrictions on the use of State funds and State property. So I don't think the Court has to reach out and decide the validity of those provisions. And, in fact, the reason that they didn't come up on appeal now is that there was an issue of outstanding to challenge them. No, but the character of the parties to this litigation permit, as applied to these parties, analysis of these two statutory sections, right? Well, it permits an analysis whether these two sections are preempted in their entirety by the NLRA. As to the parties to this case. The parties. They're not necessarily across the board to all parties under all circumstances, whether that are not necessarily parties to this action. There are other parties out there that may have an interest in this that are not incorporated within the named parties. It's true, but they seek an order that it's preempted as applied to. You're saying under all circumstances as to all parties, these sections are constitutional? No, I'm saying that. I'm saying that if there are hypotheticals in which the section might not be preempted, might be preempted as applied to a particular employer in a particular situation, that's not here for the court to decide today. It's not here to decide whether there might be some circumstances applied to a particular employer in a particular way the statute might be preempted. Plaintiffs are a bunch of employer associations that are seeking an order applicable to every single employer in California subject to the NLRA. They're not making any distinctions among those employers. If the – if the – are you suggesting that on an as-applied basis that the statute could be preempted as to some kinds of employers receiving some kinds of State funding? It could be, and the issue isn't before the court. I don't think it is. I don't think we're going to find those circumstances where the statute is preempted as applied to a particular employer because I think that the State very clearly has the right to control how its own money is spent, and this is a case about subsidized fees. So if this were a case where it was limited to those who are 100 percent funded and that was what this case was about, you don't think that there's a credible argument that the State has essentially choked off the – that entity from using money to advance its views in an election? I don't think there's a credible argument, and the reason is that the State hasn't prohibited those employers from seeking other sources of money in order to engage in the activities they want to engage in. If you set up your operation so you survive based on 100 percent State grant money, you shouldn't be surprised if you can't engage in all the activities you might wish to engage in. They can apply for grants from someone who wants to subsidize this lobbying activity of employees for and against unionization. But those companies who only use 25 percent of State grant funds, who can't afford to absorb that cost factor, if you will, are free to do so. So there's – you don't see any issue with the disparity between the two? No, I don't. And I think it's a case like the abortion cases involving indigent women, where the – even though they had a right to abortion, these are cases like Mar-V-Roe in which the government said that it wouldn't pay for abortions even when they were medically necessary for indigent women, even though they paid for childbirth. And the Supreme Court's response was that the indigency that made it difficult for these women to obtain medical care wasn't caused by the State restriction. And it's the same here with California. If California hadn't given the grants in the first place, the employer wouldn't have any money. The fact that the employer isn't seeking any other money to engage in this lobbying activity isn't really California's problem. And I think the implications of saying that California has a duty to let these employers use some of the State's grant money to engage in this activity is that there's no logical limiting principle. How much of the grant money can they use to engage in the activity? Fifty percent? Does the State have to give them enough money to run a good campaign, pro or against unionization? This comes back to Judge Beezer's first question, too, is that when does it become perhaps a transmutation between being the State's money and the employer or vendor's money at some point? While the State's getting what it's bargained for in the process, you're still saying that that dollar, as it travels through the company's stream of commerce, is still the State's money all the way through to the very end, until it's paid back to the State in taxes? No, I don't think we're dealing with business transactions here at all. I don't think we're dealing with the State buying and getting something in return. Well, if the employer pays wages, then I take it the employees still have State money in their hands and they can't engage in any kind of organizing effort within the entity that is subject to organization, right? No, I wouldn't agree with that. The statute says State money's money. The employer would have to prohibit that. No, I disagree that the employer would have to prohibit that or that the statute would ever be construed in that way. Where does the money change? Where does it change then? At what point does it change from State funds to proprietary funds of the company or the employer's funds? Where does that change, if you will, take place? At what point in the stream of commerce? When the money isn't coming from the State treasury. If the employer buys something, then the money received by the next contractor isn't received from the State treasury at all. It's received from the first contractor. But I just want to make clear that we're not talking about contracts or business transactions. When the State gives a grant of $100,000 to run a legal services program, they're entitled to buy $100,000 worth of legal services. If I'm a contractor and I hire a lawyer to resist the organization of a union within my entity, is it State money in the lawyer's hands? It's not State money in the lawyer's hands, but you can't use State grant money to pay the lawyer. No, I've used it. I've paid the lawyer up front. So the lawyer can't do that? Or I'm going to pay treble damages for hiring a lawyer? Is that what's going to happen? If you use the State's grant money to engage in an activity that is a violation of the State's grant restrictions, then you're- And the lawyer did all the dirty work. He went out and resisted. Now I'm going to pay treble damages, right? Three times what I paid the lawyer back to the State, right? Is that the way this act works? That's the way it works. Presumably the lawyer wasn't doing it on the lawyer's own initiative, but because you hired- I love it. Well, the lawyer wasn't doing it on his own initiative. The lawyer was doing it because he was hired for that purpose. And if you use State grant money for purposes other than what you get it for, you do become liable for penalties, just like if you use Federal grant money to hire a lobbyist or a lawyer to engage in lobbying. You're going to incur penalties because you're violating the restriction on the use of the money. It's not unique in this statute that people have to trace and distinguish uses of money, I take it. No, and I would- Because we're running a little bit over time. I just want one final question. Are you taking the position, disagreeing with the State, that this is a proprietary versus a regulatory function? Well, I think that it's proprietary in the State, in the sense that the State is only dealing with the use of its own money. And as the Allbach Court said, a recent D.C. Circuit decision, the State's the proprietor of its own funds, and when it asks to ensure the efficient use of its own funds, it acts as a proprietor. I think Allbach is right, and there's no need to cause a circuit conflict. And I also think to the extent the State is regulating, the State is regulating the use of its money. The State isn't regulating NLRA conduct, and that's exactly the distinction the Supreme Court made in Regan. That the government wasn't regulating lobbying activity. The government was regulating how government money is spent. Okay. And I see that I have used up my time, and I thank the Court. We've used it. Good morning, Your Honors. Bradley Campus on behalf of Plaintiff Appellees. I'd like to address one of the points which I believe you raised over what seems to be the Steam Press Holdings decision. I think it provides a very good analogy. It's more about Lynn. Which has flowed from Steam Press. No, it's flowed the other way around. It looks at it as a continuum of speech. There is certain speech which Congress has declared is to be unregulated. Non-coercive employer speech. Section 8C prohibits the National Labor Relations Board from regulating that portion of the continuum. Next, you become coercive employer speech. That is for regulation by the National Labor Relations Board under Garmin. And then you get to the far end of the continuum where it's not only defamation, but defamation that meets the New York Times standard of malice and fact, where only at that point is the state allowed to intervene and regulate under the Garmin and Machinist preemption doctrine. Well, why shouldn't the state be allowed to put conditions on grant money? It does it all the time. And employers presumably are used to accounting for restrictions on how certain monies can be used. Employers set up PACs, for example. They have to account for money under federal grants. What's so unique about the state of California saying we have conditions? If you want a grant from us, we have conditions on how you use that money. Part of it is that we're looking at two separate statutes, one of which is not before the court. The conditions have the California Medi-Cal statute, which imposes conditions on reimbursement of an employer. So, for example, if they are not providing the services that they promised to provide under the contract, the state has remedies under the Medi-Cal statute. This is one we're looking at or one we're not? That is one we are not looking at. The parties agreed that that would not be before the court. It's not before us. Correct. And that's where they were referring to imposing conditions on specific things for which an employer could be reimbursed under the state funding. And that's the Medi-Cal statute, which is not before us. Well, what's the restriction under this statute? This is a restriction on spending. And the Supreme Court has made clear that spending is a regulation in Gould, that just because it's an exercise of spending power doesn't mean that it doesn't constitute regulation. And when it's broad-brushed applicable to all employers in the state who do business, it's clear that that is regulation, not a proprietary act, as indicated in either Dillingham or the Alameda newspapers' Ninth Circuit decisions. Okay. But I still don't quite understand what your theory is that says that the state cannot put restrictions on how its money is spent, because the argument, as I understand from the employers, is that this is putting a burden on us to account for monies, this is going to intrude into this robust debate, we're going to be subject to harassment and the like. What is the problem with simply saying set up your accounts, you're subject to challenges under a variety of other circumstances where you have to account for the use of the money? I don't see the problem here. I'm not sure I see the problem anyway. I think the NLRB addressed it well in their amicus brief, where they point out that this is the statute which is imposing the state's viewpoint that employer speech interferes with employee free choice. Well, that's their opinion and that's what the NLRB says, but this is a statute on its face which says it prohibits that on both sides. No, it doesn't, Your Honor. It only prohibits employer speech. Well, either for a union or against a union. Okay, all right, but it's not saying that they may or may not take a position, it just says they can't get into the process in an advocacy way, correct? I'm sorry, I didn't quite understand, Your Honor. The restriction is that they cannot use the money to advocate within the process, for or against, right? Or to assist in any fashion, correct. To assist, all right. So what it's saying, therefore, is that you cannot put your money into the process. You're free if you want to take your own money, your private money. You can advance your points of view. The state, in other words, is not compelling the employer to take or not take a point of view with the state money. That is the means, not the purpose behind the statute. The means is to put the restriction. The purpose is to prevent employer speech based on the state purpose that it interferes with employee choice. Is the employer free to go to the National Bank of California and take a $500,000 loan and use those funds drawn on the bank to defeat a labor election in a business or in a grant organization? No, because of the commingling provision, at some point the employer would have to pay. It's a loan from the bank. And the bank is sitting on the funds. The funds are in the bank. All the checks are issued by the bank. Can the employer do that? We do not believe so because the commingling provision would prohibit you from ever repaying that loan to the bank. So once you have a dollar of state money involved, all of your accounts are infected? Yes, because it prohibits commingling, period. It doesn't say that it prohibits commingling only at the top level of receipt. It refers to employee salaries so that if they are used, paid with a commingled account that has both state funds and other funds from other sources, that there is an irrebuttable presumption that it's a violation of a statute. And union dues that are paid for organizing are derived from state employees is okay? Apparently, that's what the intervener claims, that once it's paid to the employees, then they're free to give it to the union to use for organizing. That's speech and it's protected. Okay. Why is this? What's your response on the facial versus as applied challenge? We're dealing with a lot of interesting talk this morning with legitimate questions and answers. But what's the record before us? Who are we dealing with here in this? We are dealing with a In this litigation, at this stage of it, how do we know that all of these parade of horribles and these accounting problems are or are not going to arise? We are dealing with a subset of employers, those employers that are covered by the National Labor Relations Act, as has been recognized in the Luxburg decision, that when you have a challenge as applied to a broad group, that it's still an as applied challenge. And therefore, this is not a facial challenge subject to Salerno. Well, the problem I'm having in this case is that there are all of these arguments that you advance, which indicate what can happen if this law is allowed to go into effect. And yet, what's the record? Who are we dealing with here? Just because basically what it translates into as I see it is that you're saying because the NLRA, as you say on this continuum, as you've described, carves out a free zone here, and this trenches on it in the arguments that you're making about the impact and the difficulty of segregating monies and the chilling effect, we should conclude that this statute cannot be applied to any employer who is covered by the NLRA, which is basically to say the NLRA absolutely preempts, no matter where the company gets 1% of its funding from the state or 100% of its funding. There is judicial notice of the Fountainview State Court litigation that we had made. And in that case, that employer was a 70% employer who had sufficient state funds and yet is being subject to the litigation, or has sufficient funds of private source and is still being subject to the litigation over the commingling trap that was referred to. If we have judicial notice of it, what are we supposed to derive from that? That it shows that this statute is intended to punish employers for exercising their speech rights under the National Labor Relations Act. As applied in that case, right? Correct, as an example of as applied in that case. Counsel, the way this is being presented from your perspective is that it's an all or nothing, at least maybe I'm misunderstanding it, all or nothing, the sky is falling, that all union activities are expressly prohibited under the terms of the statute. And there's just absolutely no way that any employer can engage in specific activities that engage or involve a union in any way. And I'm asking you this because there is an exception, is there not, as to certain activities that are specifically exempted from the statute, which would seem to be a pretty broad base, such as addressing a grievance, negotiating or administering a collective bargaining agreement, negotiating entering into or carrying out a voluntary recognition agreement with a labor organization. Isn't that a pretty wide area to deal with? So that's not quite as all-encompassing as you would make it seem, or at least your position is? It's not wide. We're covering a lot of different issues here, negotiating, collective bargaining. That's pretty much the entire issue that we're looking at for the most part. It's not wide within the garment of labor relations because there is a significant portion dealing with the representational area of the law as opposed to collective bargaining. And as we point out in our briefs, the exceptions that they have carved out are pro-union exceptions that the state says these are okay because they further union interest, where employer neutrality through the statute furthers employer interest or union interest, and that's why the state's imposing it in this case. One other point that we'd like to address, which was raised in the reply brief by interveners, is the deference to the National Labor Relations Board. We believe that the NLRB's position is entitled to deference before this court. In the Beth Israel Hospital decision by the United States Supreme Court, they point out that when the board is interpreting issues, interpretations of the National Labor Relations Act, they're entitled to deference as to their policy decisions in that area. The Labor Board has indicated that they have set up an entire comprehensive scheme of elections that are interfered with by this statute because of certain ground rules which they impose that are embedded upon the concept of employer free speech, and that policy decision that employer free speech furthers the interests of our national labor policy is entitled to deference. Well, then what do we do when we find that Congress puts the same identical restrictions on the use of its funds and grants? That is an issue of federalism versus what a state can do. Congress has the right to impose various kinds of restrictions that states do not have the right to. Well, that may be, but you say we look to the expertise or defer to the NLRB as a federal agency, independent agency, and the arguments that you make and the discussions about the limits on the spending power, where we find Congress putting those as the federal government on state grant recipients. And that's consistent with the Chevron decision where if a statute directly addresses the issue, then there is no deference to the board, but where the statute is silent. Well, where does the statute directly address this issue? It doesn't, and that's why the board's interpretation in this case is entitled to deference. Deference or respect? I believe deference under the language of Chevron and Beth Israel. So we should therefore ignore or not pay any attention to the federal grant restrictions because of deference to the NLRB or? In the federal grant cases, because there's a federal statute that limits the discretion of the NLRB in that area, that's correct. So that is the key distinction here, that there's the NLRA that sets national labor policy, and we are bound by or should defer to how the NLRB construes the impact of the NLRA on grant restriction language that Congress has used in federal grants, but when California uses it, the NLRA is the point of distinction. Yes. Interpreting its statute. Okay. That's what I thought your position was. If there are no further questions, thank you. Thank you. We'll give the State a few minutes to rebut since we ate up most of your time. Thank you. The first point I want to address is the Fountainview issue and the commingling. An employer doesn't have to commingle funds. There's nothing in the statute that requires them to do that. With respect to the Fountainview case, there was a suggestion that Fountainview had private funds that it could have used in order to engage in the prohibited activities under these statutes, and that they were sued anyway. The Fountainview case is really a discovery action. Had Fountainview responded to the Attorney General's request for an accounting, the Attorney General would not have filed the action asking the court to order them to turn over the records so that we could see whether or not they used state funds or private funds, the 25 percent private funds that they had. Are you saying my bank loan hypothetical is okay and does not violate the statute? I'm sorry. Could you – Did you hear my hypothetical on the bank loan? I go to the bank and I borrow $500,000 to defeat the labor election that's coming up so that none of it is state funds. All the payments to the lawyers and operatives come from the bank loan and are paid directly to the vendors who go out to defeat the election. Is that okay under the statute for somebody that has state grants? That's okay? Provided they aren't state funds. I just go to the bank and I borrow half a million dollars to defeat a labor election. Correct. And I spend it. Correct. And 100 percent of my income is grants from the state. That's okay, right? Correct. You're conceding that. Well, provided that the money isn't state money. No, it's bank money. I borrow it from the bank. Correct. The question is what money can they use to repay it? But that's after the election is all over, long gone. Well – The loan isn't due for two years. Correct. I would say that under these provisions, state money could not be used to repay that bank loan. It's going to be used to repay it two years from now. And they're still participating in the grant or the program two years from now? Yes. Or don't put the money that you got from the grant into a savings account or a CD or something else and have it come due two years from now because apparently that would still be state funds. Is that right? I believe so. I mean, we haven't – I'm drawing interest in doing everything else. That's still state funds in your mind? We really haven't thought that one through. I hate to concede it. My initial reaction is you can't use the state money in order to repay it. I don't think you can rely on the state on that anyway. The other – He'll look nice in his opinion, don't he? The other point I wanted to address that Mr. Campos raised was the reference to the Gould and the Dillingham cases. Those cases involved clear regulation. In Gould, there was a supplemental penalty for NLRA violations. The state was refusing to do business with three-time unfair labor practice offenders. That's not the case here. There's no penalty for violating the NLRA. The state court is going to focus on whether the state money was used by the employer to influence employees, regardless of whether the influence was coercive or not coercive and therefore acceptable or a violation of the NLRA. With respect to Dillingham, the intent there was to protect apprentices, not to promote some state proprietary interest in getting construction projects done on time or under budget. We have your – the briefs in this case are all quite good, so you don't have to feel that this is a be-all and end-all this morning. Thank you. We spent a lot of time on those briefs. We're looking for questions maybe even at the margin in some cases. I'll just – if I could just say a few things in closing. The state has a sovereign interest in how to spend its own money, and it should be – You know, this troubles me as a matter of philosophy. How can you have two sovereigns, a sovereign federal government and a sovereign state government? If we're talking about sovereignty, one is sovereign and the other submits to the sovereign. You can't have two sovereigns. And what we're dealing with here basically is the Commerce Clause and the regulation of trade and business. California has one version of it. The National Congress has another version of it through the National Labor Relations Act and other related labor legislation. And if the state enacts something that is contrary to the federal, which is going to take force? Not the sovereign state. It's going to be the sovereign federal government, and that's what preemption is. Now, that's the principle. So when you talk about two sovereigns, you completely lose me. Let's see the Supreme Court decisions in the federalism cases. I mean, if I can just respond to that. We don't think that the state's interest in controlling or deciding how its funds are used is something that Congress intended the NLRA to dictate. But that's not a sovereignty question, nor a preemption question. You're just saying on the face of the legislation, Congress did not include the state's expenditure of funds, and that's true. Right, but I mean the preemption principle really goes to whether or not Congress When we talk about the regulation of elections, representation elections, we're talking about labor interests that Congress has addressed. Okay? Correct. Okay. I think that's about it. I'll give you one minute. Thank you. Thank you, Your Honor. Let me just address the commingling point first. This isn't the first time that someone who got a grant had to keep the money segregated and keep track of it. In Regan, if the nonprofit organization wanted a lobby, they had to set up a separate 501c4 organization to take those funds. That's how we understand commingling and segregation. Okay. And in terms of the burden, because it's been argued that this is impossible, the only expert testimony in the record is found at Excerpts of Record 99. It's a declaration by an accountant who actually does this, who says that this is significantly less burdensome than the Federal grant restrictions. And let me just, as a final point, respond to the point about sovereignty. I don't think we're saying that the State is supreme over the Federal government here. What we're saying is that Congress is presumed to respect the State's sovereign authority, and that's what this Court said in Alameda newspapers. And the Court is reluctant to infer preemption when it would intrude on the State's authority. And this is the State trying to control its own money. And if the NLRA doesn't let the State do that, it's basically a license to misuse State grant money. Okay. All right. Thank you. The case that has been argued is submitted, and we do thank counsel for the briefing and for the arguments.
judges: Beezer, Fisher, England